## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| PASQUALINO DI FUSCO, derivatively on behalf of PEABODY ENERGY CORPORATION,<br><br>                   Plaintiff,<br><br>v.<br><br>GLENN L. KELLOW, AMY B. SCHWETZ, DARREN R. YEATES, BOB MALONE, NICHOLAS J. CHIREKOS, ANDREA E. BERTONE, STEPHEN E. GORMAN, JOE W. LAYMON, MICHAEL W. SUTHERLIN, SAMANTHA B. ALGAZE, DAVID J. MILLER, BILL CHAMPION, and MARK SPURBECK,<br><br>                   Individual Defendants,<br><br>-and-<br><br>PEABODY ENERGY CORPORATION, a Delaware corporation,<br><br>                   Nominal Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) Case No.<br>)<br>)<br>) **JURY TRIAL DEMANDED**<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Plaintiff Pasqualino Di Fusco ("Plaintiff"), by his attorneys, submits this

Verified Stockholder Derivative Complaint for Violations of Securities Laws,

Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment. Plaintiff alleges the following upon information and belief, except as to the allegations specifically pertaining to Plaintiff which are based on personal knowledge. This complaint is also based on the investigation of Plaintiff's counsel, which included, among other things, a review of public filings with the U.S. Securities and Exchange Commission ("SEC") and a review of news reports, press releases, and other publicly available sources.

## NATURE AND SUMMARY OF THE ACTION

1.     This is a stockholder derivative action brought by Plaintiff on behalf of Nominal Defendant Peabody Energy Corporation ("Peabody" or the "Company") against members of its board of directors (the "Board") and members of upper management. The wrongdoing alleged herein has caused substantial damage to Peabody's reputation, goodwill, and standing in the business community and has exposed Peabody to substantial potential liability for violations of federal securities laws and the costs associated with defending itself. The violations of the law outlined herein have damaged Peabody in the form of, among other things, millions of dollars in losses to the Company's market capitalization.

2

2.      This action seeks to remedy wrongdoing committed by Peabody's directors and officers from April 3, 2017 through the present (the "Relevant Period").

3.      Peabody Energy Corporation engages in coal mining and purports to be the largest coal mining company in the world, with 23 coal mines throughout the United States and Australia. The Company operates through Seaborne Thermal Mining, Seaborne Metallurgical Mining, Powder River Basin Mining, Midwestern U.S. Mining, Western U.S. Mining, and Corporate and Other segments. It is involved in mining, preparation, and sale of thermal coal primarily to electric utilities; the company supplies coal primarily to electricity generators, industrial facilities, and steel manufacturers. As of December 31, 2019, it owned interests in 21 coal mining operations located in the United States and Australia; and had approximately 3.6 billion tons of proven and probable coal reserves and approximately 500,000 acres of surface property through ownership and lease agreements. Peabody has coal mines in Arizona, Colorado, Illinois, Indiana, New Mexico, and Wyoming in the United States, and in Queensland and New South

Wales in Australia.[1] One of its mines in Australia is the North Goonyella mine, which was acquired by Peabody in 2004 (the "North Goonyella Mine") and through which the Company ships coal to customers in India, China and South Korea. As of the start of the Relevant Period, the North Goonyella Mine was considered Peabody's most profitable single operation, and its most profitable mine in Australia. According to Peabody's 2017 10-K filed with the SEC, the Company sold 3.4 million tons of coal from the North Goonyella Mine in the year 2017.[2]

4.     In addition, the Company engages in direct and brokered trading of coal and freight-related contracts, as well as providing transportation-related services, which involve financial derivative contracts and physical contracts.

5.     In April 2016, Peabody filed for bankruptcy protection after a sharp decline in coal prices that left the Company unable to service its $10.1 billion outstanding debt. Approximately a year later, on April 3, 2017, the Company emerged from Chapter 11 bankruptcy protection and reported record production output. At the same time, the Company touted its "record safety" achievements and

---

[1] *See* Peabody Energy Corp., Annual Report (Form 10-K) (Mar. 16, 2016).
[2] *See* Peabody Energy Corp., Annual Report (Form 10-K) (Feb. 26, 2018).

its "ongoing commitment to ensuring safe, productive operations."

6. Throughout the Relevant Period, Individual Defendants (defined below) made false and misleading statements and failed to disclose the following adverse facts pertaining to the safety practices at the Company's North Goonyella Mine, which were privately known to, or recklessly disregarded, by Individual Defendants, namely that: (a) the Company failed to implement adequate safety controls at the North Goonyella Mine to prevent the risk of a spontaneous combustion event; (b) the Company failed to follow its own safety procedures and protocols; (c) as a result, the North Goonyella Mine was subject to a heightened risk of shutdown; (d) the Company's low-cost plan to restart operations at the North Goonyella Mine posed unreasonable safety and environmental risks; (e) the Australian regulatory body responsible for ensuring acceptable health and safety standards, the Queensland Mines Inspectorate ("QMI"), would likely mandate a safer, cost-prohibitive approach; and (f) as a result, there would be major delays in reopening the North Goonyella Mine and restarting coal production.

7. The truth about the Company's inadequate safety practices emerged on September 28, 2018, when a fire erupted at the North Goonyella Mine, forcing the

Company to suspend operations indefinitely. On this news, the Company shares fell $5.54 per share, or 13.4 percent. Further, the truth about the feasibility of the Company's plan to restart operations at the North Goonyella Mine (and the inevitable major delays in reopening) was revealed through a series of subsequent disclosures.

8.     On February 6, 2019, the Company revealed that, contrary to previous statements, production at the North Goonyella Mine would not resume in 2019 but, at best, in the early months of 2020. On this news, the Company shares fell $3.80 per share, or 10.6%.

9.     On May 1, 2019, the Company reported that QMI delivered a directive which could lead to further delays and necessitate a re-evaluation of the Company's plan to restart operations at the North Goonyella Mine. On this news, the Company shares fell $1.61 per share, or 5.6%.

10.    On July 31, 2019, the Company reported additional delays to reentry at the North Goonyella Mine, explaining that QMI's requirements delayed the initial plan to reopen. As a result, the Company suspended its 2020 production guidance for the North Goonyella Mine and informed the market that it was reevaluating its

reopening. On this news, the Company shares fell by $1.06 per share, or 4.8%.

11.     On August 9, 2019, QMI released a one-page document with its preliminary investigative findings indicating that the Company suffered from deficient safety systems at the North Goonyella Mine and was not cooperating fully with QMI's investigation. On this news, the Company's stock fell $0.37 per share, or 2 percent.

12.     Finally, on October 29, 2019, the Company disclosed that QMI was placing restrictions on the reopening and that, as a result, the Company was forced to drastically adjust its reentry plan at the North Goonyella Mine, ultimately announcing a three year or more delay before any meaningful coal could be produced. On this news, the Company's share price declined $3.56 per share, or 22 percent.

13.     As detailed herein, and as alleged in the ongoing federal securities class action in the United States District Court for the Southern District of New York, styled *Oklahoma Firefighters Pension and Retirement System v. Peabody Energy Corporation et al.,* Case No. 1:20-cv-08024-PKC, (the "Federal Securities Class Action"), Peabody's officers and directors substantially damaged the Company by

7

filing false and misleading statements that omitted material adverse facts.

## **JURISDICTION AND VENUE**

14.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. §78n(a)(1), Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, and Section 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1) and raise a federal question pertaining to the claims made in the Securities Class Actions based on violations of the Exchange Act.  This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

15.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that would not otherwise have such jurisdiction.

16.     This Court has personal jurisdiction over each of the Individual Defendants because each Defendant is either a corporation incorporated in this District or he or she is an individual who has minimum contacts with this District to justify the exercise of jurisdiction over them.

17.     Venue is also proper in this District because Peabody is a corporation incorporated in Delaware.

## THE PARTIES

### Plaintiff

18.     Plaintiff Pasqualino Di Fusco is and has continuously been a stockholder of Peabody during the wrongdoing complained of herein.

### Nominal Defendant

19.     Defendant Peabody is a Delaware corporation with its principal executive offices at 701 Market Street, Saint Louis, Missouri 63101. Peabody's shares trade on the NYSE under the ticker symbol "BTU."

### Individual Defendants

20.     Defendant Glenn L. Kellow ("Defendant Kellow") has served as the Company's chief executive officer ("CEO") and President since January 2015, after being named CEO-elect and joining the board of directors. In addition to his executive roles, Defendant Kellow has been a director since 2015. For the fiscal year ended December 31, 2019, Defendant Kellow received $7,610,823 in total compensation from the Company.

21.     Defendant Amy B. Schwetz ("Defendant Schwetz") served as the

Company's Chief Financial Officer ("CFO") and Executive Vice President until her resignation on February 5, 2020. For the fiscal year ended December 31, 2019, Defendant Schwetz received $2,302,506 in total compensation from the Company.

22.    Defendant Darren R. Yeates ("Defendant Yeates") has served as the Company's Chief Operating Officer ("COO") and Executive Vice President since November 1, 2020. He has been a director since February 2020. Defendant Yeates has previously served as a member of the Audit Committee and the Health, Safety, Security & Environmental Committee, but has now stepped down from those positions.

23.    Defendant Bob Malone ("Defendant Malone") has been a Company director since 2009. He serves as the Non-Executive Chairman of the Board. For the fiscal year ended December 31, 2019, Defendant Malone received $389,974 in total compensation from the Company.

24.    Defendant Nicholas J. Chirekos ("Defendant Chirekos") has been a director since 2017. He is also a member of the Audit Committee and the Nominating & Corporate Governance Committee. For the fiscal year ended December 31, 2019, Defendant Chirekos received $247,474 in total compensation from the Company.

10

25.     Defendant Andrea E. Bertone ("Defendant Bertone") has served as a Company director since 2019. She is also a member of the Audit Committee and the Health, Safety, Security & Environmental Committee. For the fiscal year ended December 31, 2019, Defendant Bertone received $268,289 in total compensation from the Company.

26.     Defendant Stephen E. Gorman ("Defendant Gorman") has served as a Company director since 2017. He also serves as a member of the Compensation Committee, the Executive Committee, and is the Chair of the Executive and Health, Safety, Security & Environmental Committees. For the fiscal year ended December 31, 2019, Defendant Gorman received $259,974 in total compensation from the Company.

27.     Defendant Joe W. Laymon ("Defendant Laymon") has served as a Company director since 2017. He also serves as the Chair of the Company's Compensation Committee, a member of the Executive Committee, and a member of the Health, Safety, Security & Environmental Committee. For fiscal year 2019, Defendant Laymon received $254,974 in total compensation from the Company.

28.     Defendant Michael W. Sutherlin ("Defendant Sutherlin") has served as

a Company director since 2014. He also serves as the Chair of the Company's Nominating & Corporate Governance Committee and is a member of the Compensation Committee and the Executive Committee. For the fiscal year ended December 31, 2019, Defendant Sutherlin received $254,974 in total compensation from the Company.

29.     Defendant Samantha A. Algaze ("Defendant Algaze") has served as a Company director since 2020. Defendant Algaze is also a member of the Company's Nominating & Corporate Governance Committee.

30.     Defendant Bill Champion ("Defendant Champion") has served as a Company director since July 2020. He currently serves on the Audit Committee and Health, Safety & Environmental Committee.

31.     Defendant David J. Miller ("Defendant Miller") has served as a Company director since 2020. He is also a member of the Executive Committee and the Compensation Committee.

32.     Defendant Mark Spurbeck ("Defendant Spurbeck") has served as the Company's CFO since June 2020. He replaced Defendant Schwetz, upon her resignation from the position of CFO with the Company, as outlined above.

33.    Collectively, Individual Defendants Kellow, Schwetz, Yeates, Malone, Chirekos, Bertone, Gorman, Laymon, Sutherlin, Algaze, Miller, Champion and Spurbeck, are referred to herein as the "Individual Defendants."

34.    The Individual Defendants, because of their positions with Peabody, possessed the power and authority to control the contents of Peabody's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors. Each of the Individual Defendants was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance, or had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and/or misleading.

## **SUBSTANTIVE ALLEGATIONS**

**Background**

35.    According to Peabody's website, "We provide essential products to fuel

13

baseload electricity for emerging and developed countries and create the steel needed to build foundational infrastructure."[3] The Company was incorporated in Delaware in 1998 and became publicly traded in 2001.[4]

36.     The Company's coal mines are organized into six business segments: Powder River Basin Mining, Midwestern U.S. Mining, Western U.S. Mining, Australian Metallurgical Mining, Australian Thermal Mining, and Trading and Brokerage.[5] The largest segment is the Australian Metallurgical Mining segment, where the Company operates seven mines in Australia. In 2016, the Australian Metallurgical Mining segment accounted for 23.1% of the Company's revenues.

**The North Goonyella Mine**

37.     In April 2004, the Company purchased the North Goonyella Mine, as part of its Australian Metallurgical Mining segment. The North Goonyella Mine is an underground coal mine located in Queensland, Australia, about 95 miles from

[3] All About Peabody, https://www.peabodyenergy.com/Who-We-Are/All-About-Peabody (last visited January 18, 2021).

[4] Peabody Energy Corp., Annual Report (Form 10-K) (Mar. 22, 2017).

[5] *Id*.

Mackay. Coal from this mine is transported to ships at Australian ports for export to customers in India, China, and South Korea.

38.     In May 2019, *The Australian Financial Review* published an article, wherein it reported that the North Goonyella Mine is the "most profitable single operation [of the Company]".[6]  In 2017 the North Goonyella Mine generated approximately $100 million out of the total operating profit of $498 million. This revenue accounts for approximately 20% of the Company's total operating profit for 2017. In May 2017, Defendant Kellow described the North Goonyella Mine as a "high margin mine" that is the "core of [Peabody's] met coal platform."

39.     To excavate coal from the North Goonyella Mine, the Company uses a method called longwall mining. Longwall mining uses heavy machinery to cut large panels of coal, frequently up to 1,500 feet wide and two miles long. Longwall mining often causes methane and other dangerous, flammable gases to linger underground, high concentrations of which often occur when production rates are high and

---

[6] Matthew Stevens, *Peabody rewrites the rulebook after wildfire at North Goonyella*, Financial Review (Mar. 28, 2019), https://www.afr.com/companies/mining/peabody-rewrites-the-rulebook-after-wildfire-at-north-goonyella-20190327-p51853.

longwall mining equipment is repositioned within the mine. This leaves the mine prone to spontaneous combustion events when the high concentrations of flammable gases come into contact with a heat source. As a result, it is imperative that mines using the longwall mining method implement adequate safety measures to protect against these risks, including, among others, ventilation systems, methane drainage methods, gas monitoring controls, and airtight seals.

40.     Due to the aforementioned risks, the Company's Board of Directors (the "Board") has a "Health, Safety, Security, and Environmental Committee" (the "Safety Committee") responsible for reviewing significant mine safety risks, policies, and performance with Company management. The Safety Committee held 8 meetings in 2017 and 9 meetings in 2018.

41.     On April 13, 2016, the Company filed for bankruptcy protection under Chapter 11 of the U.S. Bankruptcy Code after a multi-year decline in coal prices that impacted the Company's ability to service its $8.8 billion debt load. As a result, the Company's stock was delisted from the NYSE.

42.     However, on April 3, 2017, the Company announced that it had emerged from bankruptcy and that the Company's stock would begin trading again

on the NYSE.

43.     Following its emergence from bankruptcy, Peabody was faced with a fragile economic situation, including a high debt load, and thus was motivated to produce high amounts of coal while cutting costs in order to boost the Company's profit.

**The Individual Defendants' False and Misleading Statements**

44.     At the beginning of the Relevant Period, the North Goonyella Mine reported record production output. As Individual Defendants lauded North Goonyella's record production output, they misled the market about the sustainability of North Goonyella's coal production by failing to disclose that the Company's inadequate safety measures had put the mine at a heightened risk of complete shutdown.

45.     On April 3, 2017, Peabody announced that it had emerged from Chapter 11 bankruptcy protection and that the Company's stock would begin trading again on the NYSE under the ticker symbol "BTU."[7] According to the Press Release, the

---

[7] Press Release, Peabody Energy Corp., *Peabody Emerges From Chapter 11 Protection, To List On New York Stock Exchange Under Ticker Symbol NYES:BTU* (Apr. 3, 2017), https://www.peabodyenergy.com/Media-Center/Newsroom.

17

Company also reported that:

> In the past year, the Company has reduced debt by more than $5 billion from pre-filing levels at March 2016. In addition, the Company achieved record safety this past year; protected jobs; served global customers; reduced costs and built cash and liquidity; strengthened the Australia platform; accelerated coal mine restoration; provided third-party bonding assurances; and was recognized globally for sustainability.[8]

46.     On May 4, 2017, the Company reported positive financial results for its first quarter of 2017.[9] The Company reported that its first quarter of 2017 revenues, net income, and Earnings Before Interest, Taxes, Depreciation, and Amortization ("Adjusted EBITDA") showed substantial increases over the first quarter of 2016.[10]According to the Company's press release reporting earnings for first quarter of 2017:

> Revenues increased 29 percent to $1.33 billion.   Net income attributable to common stockholders increased $287.2 million to $122.1 million, the highest net income in nearly five years, and income from continuing operations net of income taxes rose $292.7 million to $131.0 million.  Adjusted EBITDA increased $304.9 million to $390.0

---

[8] *Id.*

[9] Press Release, Peabody Energy Corp., *Peabody Reports Earnings For Quarter Ended March 31, 2017; Revises Financial Targets For Full-Year 2017* (May 4, 2017), https://www.peabodyenergy.com/Media-Center/Newsroom.

[10] *Id.*

million.

47.    On May 4, 2017, In the first quarter of 2017 earnings release, Defendant Kellow said:

> The emerged Peabody is proceeding with a new balance sheet, improved industry fundamentals and a sharp focus on creating value. […] This focus begins with an emphasis on safe and productive operations that are constantly working to move down the cost curve; carries forward with intense management of both the asset and liability side of our balance sheet; and extends to our financial strategies that are aimed at prioritizing higher returns for shareholders.[11]

48.    On the same date, the Company hosted a conference call with analysts and the market to discuss its results. Defendant Kellow ended the call by reiterating the Company's focus on safety at mines: "I would in closing like to extend my appreciation to our employees around the world for their ongoing commitment to ensuring safe, productive operations and continued delivery of value."

49.    In the conference call, Defendant Kellow stressed the importance of the North Goonyella Mine to the Company's overall financial wellbeing, in response to an analyst's question. Defendant Kellow answered:

> I think the high return is probably the key there. And I've said we'd regard the coal or the met coal platform as being those high-margin

---

[11] *Id.*

19

mines in Coppabella on PCI and North Goonyella on hard coking coal. So, I think the capital allocations and capital priorities and the ability to expand, I think our focus would first and foremost be around those mines with respect to capital.

50. Kellow additionally stressed that those two mines are "what we believe [to be] two high quality, high margin mines in North Goonyella and Coppabella."

51. On July 10, 2017, the Company filed its 2016 Form 10-K/A with the SEC. Under a heading "Risk Factors," and "Risks inherent to mining could increase the cost of operating our business," the Company stated: "Our mining operations are subject to conditions that can impact the safety of our workforce, or delay coal deliveries or increase the cost of mining at particular mines for varying lengths of time. These conditions include . . . fires and explosions from methane gas or goal dust." The Company continued: "Despite our efforts, such conditions could occur and have a substantial impact on our results of operations, financial condition or cash flows." These potential risk disclosures were repeated in the Company's first quarterly report filed with the SEC for 2017 ("1Q 2017 10-Q"), second quarterly report filed with the SEC for 2017 ("2Q 2017 10-Q"), third quarterly report filed with the SEC for 2017 ("3Q 2017 10-Q"), first quarterly report filed with the SEC for 2018 ("1Q 2018 10-Q"), second quarterly report filed with the SEC for 2018

20

("2Q 2018 10-Q") and the annual report filed with the SEC for 2017 ("2017 10-K").

52.     On August 1, 2017, the Company reported positive financial results for the second quarter 2017 ("2Q 2017").[12] The Company reported revenues rose 21%, from $1.04 billion to $1.26 million. Australian metallurgical revenue per ton increased 114% and thermal revenue per ton increased 41%. The Company reported 2Q 2017 adjusted EBITDA of $347.8 million, an increase of $245.2 million from the same period in the prior year.  Adjusted EBITDA was led by the Australian platform, which outpaced U.S. contributions, and contributed an additional $181.6 million over the prior year.

53.     On August 1, 2017, the Company hosted its 2Q 2017 earnings conference call.[13] On that call, Defendant Kellow stated that "[o]perationally, the

---

[12] Press Release, Peabody Energy Corp., *Peabody Reports Earnings For Quarter Ended June 30, 2017; Formalizes Debt Reduction And Capital Return Initiatives* (Aug. 1, 2017), https://peabodyenergy.investorroom.com/2017-08-01-Peabody-Reports-Earnings-For-Quarter-Ended-June-30-2017-Formalizes-Debt-Reduction-And-Capital-Return-Initiatives.

[13] *Peabody Energy's (BTU) CEO Glenn Kellow on Q2 2017 Results - Earnings Call Transcript*, Seeking Alpha (Aug. 1, 2017, 5:40 PM), https://seekingalpha.com/article/4093379-peabody-energys-btu-ceo-glenn-kellow-on-q2-2017-results-earnings-call-transcript.

second quarter marked the best six months of production over the past five years at the North Goonyella Mine." Thereafter, Defendant Kellow again reiterated the Company's continued focus on safety at its mines, reporting that he "would like to extend my appreciation to all our employees both at the mines and in offices for their continued commitment to ensuring safe and productive environments."

54.    On October 25, 2017, in its third quarter earnings call, the Company reported positive financial results for the third quarter 2017 ("3Q 2017").[14] The Company reported revenues rose 22% from the prior year to $1.48 billion. The Company said that the rise in revenue was from the $251.3 million increase in Australian revenue, a 60% increase in realized revenues per ton and a 9% increase in metallurgical coal volumes. Defendant Schwetz is quoted in the Company's press release stating: "Peabody continues to take aggressive actions to reduce debt and advance the shareholder return initiatives we outlined in August."

55.    On October 25, 2017, the Company hosted its 3Q 2017 earnings call

---

[14] Press Release, Peabody Energy Corp., *Peabody Reports Earnings for Quarter Ended September 30, 2017* (Oct. 25, 2017), https://peabodyenergy.investorroom.com/2017-10-25-Peabody-Reports-Earnings-For-Quarter-Ended-September-30-2017.

with analysts and the market.[15] In this call, Defendant Kellow stated: "Through all of our actions, Peabody maintains constant vigilance toward safety."

56.     On February 7, 2018, the Company reported positive financial results for the fourth quarter ("4Q 2017) and full year 2017.[16] The Company reported revenues of $1.52 billion for the fourth quarter of 2017, a 5% increase over the prior year. It noted the increased revenue was driven by higher Australian metallurgical and thermal coal pricing, and other factors and that fourth quarter adjusted EBITDA increased $122.2 million over the prior year to $416.2 million. The Company further reported full-year 2017 revenue of $5.58 billion, a 5% increase over the prior year, and full-year adjusted EBITDA of $1.49 billion.

57.     On February 7, 2018, on the 4Q 2017 Earnings Call, Defendant Kellow stated: "At the operation level, our global safety performance continues to surpass

---

[15] *Peabody Energy's (BTU) CEO Glenn Kellow on Q3 2017 Results - Earnings Call Transcript*, Seeking Alpha (Oct. 25, 2017), https://seekingalpha.com/article/4116507-peabody-energys-btu-ceo-glenn-kellow-on-q3-2017-results-earnings-call-transcript.

[16] Press Release, Peabody Energy Corp., *Peabody Reports Earnings For Quarter And Year Ended December 31, 2017* (Feb. 7, 2018), https://peabodyenergy.investorroom.com/2018-02-07-Peabody-Reports-Earnings-For-Quarter-And-Year-Ended-December-31-2017.

industry averages. While our incidence rate edged up overall from the prior year, our Australian platform had a record year, improving 17% from 2016. As always, we are ever vigilant on our journey of continuous improvement in safety."[17] He also stated: "As always, we begin with a focus on safe productive operations and return maximization."

58.     On February 22, 2018, in the Company's Analyst and Investor Day presentation, the Company brought spotlight to the North Goonyella Mine and represented that "Record safety results reflect 80% improvement since 2013."[18]

59.     On April 25, 2018, the Company again reported on its website, positive financial results for the first quarter 2018.[19] The Company reported revenues for the

---

[17] *Peabody Energy's (BTU) CEO Glenn Kellow on Q4 2017 Results - Earnings Call Transcript*, Seeking Alpha (Feb. 7, 2018), https://seekingalpha.com/article/4144276-peabody-energys-btu-ceo-glenn-kellow-on-q4-2017-results-earnings-call-transcript.

[18] Peabody Energy Corp., *Peabody Analyst and Investor Day* (Feb. 22, 2018), https://www.peabodyenergy.com/Peabody/media/MediaLibrary/Investor%20Info/FINAL-Combined.pdf.

[19] Press Release, Peabody Energy Corp., *Peabody Reports Earnings for Quarter Ended March 31, 2018* (Apr. 25, 2018), https://peabodyenergy.investorroom.com/2018-04-25-Peabody-Reports-Earnings-For-Quarter-Ended-March-31-2018.

first quarter of 2018 rose 10% over the prior year to $1.46 billion, driven in part by increased metallurgical coal volumes. The Company also report adjusted EBITDA of $363.9 million for 2018, a 7% increase over the prior year.

60.    On April 25, 2018, the Company hosted a conference call with analysts and the market to discuss the Company's results, where Defendant Kellow concluded the call by thanking employees for the Company's "ongoing focus on safe productive work places [sic]."[20]

61.    In or around May 2018, the Company published its 2017 Corporate and Social Responsibility Report ("the Report").[21] Under the Company's "Safety" values section, the Company boasted that "We commit to safety and health as a way of life" and that "Safety is Peabody's first value, integrated into all areas of our business." It further reported that "Our goal is to eliminate all workplace incidents, including

---

[20] *Peabody Energy's (BTU) CEO Glenn Kellow on Q1 2018 Results - Earnings Call Transcript*, Seeking Alpha (Apr. 25, 2018), https://seekingalpha.com/article/4165855-peabody-energys-btu-ceo-glenn-kellow-on-q1-2018-results-earnings-call-transcript.

[21] Peabody Energy Corp., *2017 Corporate and Social Responsibility Report*, https://www.peabodyenergy.com/Peabody/media/MediaLibrary/Media%20Center/CSR%20web%20photos/Peabody_CSR2017.pdf.

injuries, occupational illnesses and property damage." In relation to the North Goonyella Mine, the Company reported that "A focus on improving culture and doing business better lifted the North Goonyella Underground Mine to new records for performance in safety, production and development in 2017." The Report discussed "Project Excellence," which stated: "[It] is Peabody Australia's cost and productivity improvement plan that has driven initiatives critical to the platform's sustainability **without compromising safety**, achieving 2017 savings of about $130 million. **The platform boasted its best-ever safety performance** and reclaimed more than 1,200 acres of land." (Emphasis added).

62.     Included in the Report was a Letter from President and CEO, Defendant Kellow, which touted the Company's safety record: "Peabody's global safety performance continues to surpass industry averages. The Australian platform achieved a **record safety year in 2017**, and **we remain ever vigilant on our journey of continuous improvement in safety.**" (Emphasis added).

63.     On July 24, 2018, the Company reported on its website positive

financial results for the second quarter 2018.[22] The Company reported that both revenues and adjusted EBITDA for the second quarter increased to $1.31 billion and $369.6 million, respectively. It further noted that second quarter 2018 revenues and adjusted EBITDA increased 4% over prior year and a $51.8 million over prior year, respectively.

64.    On July 24, 2018, the Company hosted an earnings conference call, where Defendant Kellow again concluded the call with the Company's "continued focus on safe and productive workplaces."[23]

65.    In the Company's August 2018 Investor Presentation, the Company boasted that its "[s]afety performance continues to outperform industry averages," and that it paid "[s]trong attention to operational excellence by committing to safe workplaces, maximizing resource recovery, improving environmental performance

---

[22] Press Release, Peabody Energy Corp., *Peabody Reports Earnings For Quarter Ended June 30, 2018* (July 24, 2018), https://peabodyenergy.investorroom.com/2018-07-24-Peabody-Reports-Earnings-For-Quarter-Ended-June-30-2018.

[23] *Peabody Energy Corp (BTU) CEO Glenn Kellow on Q2 2018 Results - Earnings Call Transcript*, Seeking Alpha (July 24, 2018), https://seekingalpha.com/article/4189602-peabody-energy-corp-btu-ceo-glenn-kellow-on-q2-2018-results-earnings-call-transcript.

and restoring mined lands."[24]

66.     On September 18, 2018, *The Australian Financial Review* reported that work had been suspended at the North Goonyella Mine due to elevated methane and carbon monoxide levels. This contradictory news came after the Company had repeatedly touted its safety record at the North Goonyella Mine site for over a year. *The Australian Financial Review* further reported that "multiple sources have indicated that the coal is generating excessive levels of heat, that this is the source of the gas accumulation and that management is uncertain why or where this unanticipated burst of heat is coming from." Moreover, the report explained that "[t]hose same sources estimate that mine management has no more than two weeks to solve both issues because a half-moved longwall 'cannot just sit down there for too long without moving.'"

67.     A day later, on September 19, 2018, the Company released a statement on the North Goonyella Mine.[25] The Company acknowledged: "About 2 ½ weeks

---

[24] Peabody Energy Corp., *Investor Presentation* (Aug. 2018), https://www.peabodyenergy.com/Peabody/media/MediaLibrary/Investor%20Info/August-NDRS-2018-Investor-Presentation.pdf.

[25] Press Release, Peabody Energy Corp., *Peabody Statement on North Goonyella*

ago, an area of the North Goonyella Mine began registering higher gas levels, suggesting modest elevated temperatures and low-level oxidation of some coal." However, the Company minimized the concerns by stating that "[m]ine management quickly assessed the facts [and] took appropriate steps." The Company reassured investors in the statement that "the company had been trending to the upper end of its 2018 metallurgical coal sales volume targets, and those targets have not been revised."

68.     On September 19, 2018, the Company filed a Form 8-K with the SEC providing notice to investors that the Company reported that the longwall move at the North Goonyella Mine was interrupted "by temporarily elevated gas levels."[26] The Form 8-K also stated that "the [C]ompany is working toward resuming operations."

69.     On September 25, 2018, the Company issued another Form 8-K and

---

*Mine* (Sept. 19, 2018), https://peabodyenergy.investorroom.com/press-releases?item=1009.

[26] Peabody Energy Corp., Current Report (Form 8-K) (Sept. 19, 2018), https://www.sec.gov/Archives/edgar/data/1064728/000106472818000030/form8krestatement.htm.

reassured investors of the issues of the North Goonyella Mine, such as the imminent risk of combustion, by reporting that "gas levels at its North Goonyella Mine have been variable and remain elevated. The company is working with the Queensland Mines Inspectorate ("QMI") and third-party experts as we continue a progressive plan aimed at reducing gas levels and accommodating a safe return to mining operations."

70.     The statements referenced above were materially false and misleading when made because they failed to disclose the following adverse facts pertaining to the safety practices at the Company's North Goonyella Mine site: (a) the Company had failed to implement adequate safety controls at the North Goonyella Mine to prevent the risk of a spontaneous combustion event; (b) the Company failed to follow its own safety procedures; and (c) as a result, the North Goonyella Mine was at a heightened risk of shutdown.

71.     Despite the above attempts to minimize the operational issues at the North Goonyella Mine and reassure investors, on September 28, 2018, the Company issued a press release reporting that a fire had erupted within the North Goonyella

Mine that caused the Company to evacuate the North Goonyella Mine.[27] Peabody further stated that it did "not expect any production from North Goonyella in the fourth quarter of 2018."[28] On this news, the Company's stock fell $5.54, or 13.5 percent, closing at $35.64 on September 28, 2018, down from the previous day's close of $41.18.[29]

72.     An article by *The Daily Mercury* published on September 28, 2018 quoted a long- time underground operator at the North Goonyella Mine as stating that employees had been told not to talk about the incident: "We're told 'don't talk to the media, don't talk to the media' but I think people have a right to know."[30]

---

[27] Press Release, Peabody Energy Corp., *Statement Regarding North Goonyella Developments* (Sept. 28, 2018), https://peabodyenergy.investorroom.com/press-releases?item=1014.

[28] Press Release, Peabody Energy Corp., *Peabody Provides Update On North Goonyella* (Sept. 28, 2018), https://peabodyenergy.investorroom.com/2018-09-28-Peabody-Provides-Update-On-North-Goonyella.

[29] *Friday's Energy Stocks: Musk's fraud charges send Tesla shares plummeting*, https://www.capitaliq.com/CIQDotNet/News/Article.aspx?companyId=32792&nab=True&newsItemId=244174631&stateKey=85cf6c4862d94f4dac732c65f21a7655 (last viewed Jan. 18, 2021).

[30] *North Goonyella an explosion waiting to happen…*, Daily Mercury (Sept. 28, 2018), https://www.dailymercury.com.au/news/north-goonyella-an-explosion-waiting-to-happen-fir/3536670/ (last viewed Jan. 29, 2021).

73.    On October 2, 2018, in providing an update on the North Goonyella Mine, the Company stated on its website that the fire was mostly contained and that at the appropriate time the Company would initiate a formal review of the fire.[31] Further, on October 11, 2018, the Company disclosed on its website and claimed to "welcome" the QMI's announcement that it would commence a safety investigation into the Company related to the events leading up to the North Goonyella fire.[32]

74.    However, the Company continued to mislead the market about its plan to restart operations at the North Goonyella Mine, even after the fire and the announcement of both an internal and a governmental investigation. While continuing to conceal major issues that would impede any progress at the North Goonyella Mine and which would ultimately cause QMI to reject its plans, the Company falsely assured the market that the Company would be able to mine

---

[31] Press Release, Peabody Energy Corp., *Peabody Provides Update On North Goonyella* (Oct. 2, 2018), https://peabodyenergy.investorroom.com/2018-10-02-Peabody-Provides-Update-On-North-Goonyella.

[32] Press Release, Peabody Energy Corp., *Peabody Provides Update On North Goonyella* (Oct. 11, 2018), https://peabodyenergy.investorroom.com/2018-10-11-Peabody-Provides-Update-On-North-Goonyella.

significant coal at the North Goonyella Mine in the near-term. The statements conditioned the market to believe that the Company's low-cost plan to restart operations at North Goonyella after the fire (the "plan") was reasonable and had a high likelihood of regulatory approval, while simultaneously omitting to disclose that the plan posed unreasonable safety and environmental risks such that QMI would likely mandate a safer, more cost-prohibitive approach that would cause major delays in restarting the North Goonyella Mine.

75.    On October 30, 2018, the Company hosted a conference call with analysts and the market to discuss the Company's third quarter 2018 financial results, where Defendant Kellow reassured investors that the Company would be able to restart mining operations at North Goonyella. Defendant Kellow stated: "based on the market reaction, it would seem that the market contemplates an entire loss of North Goonyella. While we very much understand the concern, based on what we know today, that conclusion is at best premature and at worst unwarranted." Defendant Kellow informed the market that "production will be targeted for the second half of 2019." Defendant Schwetz echoed these points and stated: "The company will take all steps to work safely, progress the plan and look

to mitigate costs, while pursuing options for a resumption of activities at the appropriate time." On this news, the Company's stock price increased by 3.4 percent.

76.     However, the Company continued to mislead the market about its plan to restart operations at the North Goonyella Mine, even after assuring the market that production output at North Goonyella would be pushed back but not completely abandoned. The above statements further lead the market to believe that the Company's plan was reasonable with high likelihood of regulatory approval, or with alternative cost-effective measures. The Company simultaneously omitted to disclose that the plan posed unreasonable safety and environmental risks that would cause major delays in restarting the North Goonyella Mine, or receive a denial from the QMI for unsatisfactory mine conditions.

77.     Analysts equated Individual Defendants' reassurances regarding the North Goonyella mine to the rising stock value. J.P. Morgan reported on October 30, 2018: "[t]he market has warmed to Peabody's recovery plan for North Goonyella with the stock rising 4.7% compared with the S&P's +0.85 so far today. As CEO Kellow suggested, some investors seem to believe the mine was lost to a fire, and Peabody's plan shows that closure is neither the company's #1 or #2 scenario."

78.     However, on February 6, 2019, the Company reported disappointing earnings for the fourth quarter 2018 ("4Q 2018"), weak Q4 2018 coal production, and a soft 2019 outlook due to remediation costs and lack of production at the North Goonyella Mine. On the earnings call, Defendant Kellow revealed that production at the North Goonyella Mine was now targeted to "begin to ramp up in the early months of 2020." On this news, the Company's stock fell $3.80, or 10.6 percent, closing at $32.05 on February 6, 2019, down from the previous day's close of $35.85.

79.     Defendant Kellow continued to mislead the market regarding the likelihood that production at the North Goonyella mine would restart in the near-term, by reassuring the market that: "While there is so much work ahead of us, our base case contemplates **approximately 2 million tons of sales from North Goonyella in 2020.**" (Emphasis added).

80.     The above statement was false because the Company continued to mislead the market about its ability to restart operations at the North Goonyella Mine and fulfill coal production estimates, even after reporting disappointing 4Q 2018 earnings and weak 4Q 2018 coal production. While further concealing from the

market the North Goonyella Mine conditions, known to Individual Defendants, that would result in major delays due to cost-prohibitive requirements or regulatory denial from QMI about the North Goonyella Mine's safety conditions, the statements convinced the market that the Company's coal production and earnings would be recouped through near-term mine operations restarting, when, in fact, given the above factors, production and earnings would not be recouped, as Individual Defendants knew or ought to have known. The lavish sales figures for the North Goonyella Mine, stated above, predictably enticed the investing public to believe that the Company was more profitable than it was.

81. On March 27, 2019, the Company issued a press release entitled "Peabody Releases Initial Learnings From North Goonyella Incident." In that press release, the Company disclosed that the fire resulted from high gas levels during a planned longwall move and further admitted that its safety precautions were insufficient. As a result of the fire, the company's President of Australian Operations said Peabody was "making changes in systems, processes and training, where warranted, to put into place the improvements needed to successfully move forward from this incident." Changes included: improvements to ventilation controls, gas

level monitoring, longwall relocation processes, and underground sealing methods.

82.    On May 1, 2019, the Company issued a Form 8-K reporting positive first quarter 2019 earnings that met analysts' estimates.  However, the Company also reported that it was "currently complying with a directive concerning documentation from the Queensland Mines Inspectorate, following a thorough review, which has resulted in a multi-week delay to the initial project plan." The Company further stated that "[i]f further delays occur, the company will re- evaluate its re-ventilation and re-entry plans, including longwall production targets, quarterly project costs and capital expenditures." On this news, the Company's stock fell $1.61, or 5.6 percent, closing at $27.16 on May 1, 2019, down from the previous day's close of $28.77.

83.    In contrast, the Company continued to mislead the market regarding the possibility of regulatory approval from QMI and the timeline for restarting the North Goonyella Mine. On the same date as the Company's first quarter 2019 earnings, the Company hosted a conference call with analysts and the market, where Defendant Kellow stated:

> Our focus at this point is working through that process, responding to their requests for information and then being able to – as I said, everything's ready to flick the switch and to be out to re-ventilate and

that will enable this thing to monitor and then re-enter the mine and have a better assessment.

*      *      *

At that point we look to re-examine the overall timing and sequencing on the project plan, but just to reiterate, we're ready to go, so we're just working through that, what is a final part of the process. . . It's dotting the I's and crossing the T's around supporting documentation with respect to chisel-out procedures and protocols that are on the wrong side.

On the call, Defendant Schwetz reiterated this point: "Related to North Goonyella**, in the first quarter, we completed segmenting of the mine into multiple zones to facilitate a phased re-ventilation and re-entry**. In addition, all physical activities in advance of reventilating the first segment of the mine have been completed." (Emphasis added).

84.     On May 1, 2019, J.P. Morgan reported that: "The company also reported that it is ready to re-enter the first portion of the North Goonyella mine but has been delayed as the Queensland Mine regulator reviews documents."  On the same date, Deutsche Bank reported that "North Goonyella [is] undergoing multi-week delay due to Queensland Mines Inspectorate review, but guide of  …  production of 2020 remains unchanged[,]" (estimated 2 million tons of produced coal). These reports

show that analysts believed and mirrored Individual Defendants' statements when they reported information about the Company to the investing public.

85.     On July 31, 2019, the Company issued a Form 8-K again reporting positive earnings for the second quarter 2019. However, the Company blamed delays on reentering the North Goonyella Mine because of QMI: "Advancement during the recovery phase has been subject to the discretion of the regulatory authority, special protocols and substantial related administrative requirements which has resulted in a far slower rate of progress than originally contemplated."  As such, the Company suspended its 2020 production guidance at the North Goonyella Mine and informed investors that it was reevaluating its entire reentry plan. Defendant Kellow announced that the Company had hired an outside firm to evaluate its organizational structure.  On this news, the Company's stock fell $1.06, or 4.8 percent, closing at $21.06 on July 31, 2019, down from the previous day's close of $22.12.

86.     Also on July 31, 2019, analysts with J.P. Morgan connected this stock drop to the news about North Goonyella, reporting that "we expect the North Goonyella news will dominate  and depress the market's reaction to [other positive Company news.]" Later that day, they confirmed: "[t]he market did not react well to

Peabody's announcement of delays at North Goonyella."

87.    On the same date, the Company hosted a conference call with investors and analysts to discuss its second quarter 2019 financial results. On this call, Defendant Kellow touted the Company's progress at the North Goonyella Mine and reiterated delays due to QMI: "Turning to North Goonyella, major progress has been made to-date including re-ventilation and re-entry of the mine. We've also learned a substantial amount since we commenced activities underground earlier this month. [W]e also progressed at a much slower rate than originally contemplated."

88.    On August 4, 2019, analysts with Deutsche Bank noted that "Key catalysts for the stock include . . . progress at North Goonyella where we expect the market has now rebased down, so any announcements could be positive."

89.    On August 9, 2019, QMI released a one-page document with its preliminary investigative findings titled, "Queensland Mines Inspectorate preliminary observations: North Goonyella High Potential Incident,"[33] indicating

---

[33] *Queensland Mines Inspectorate preliminary observations: North Goonyella High Potential Incident* (Aug. 9, 2019), https://www.dnrme.qld.gov.au/__data/assets/pdf_file/0005/1453361/north-goonyella-high-potential-incident.pdf.

that the Company had deficient safety systems at North Goonyella and that the Company was not cooperating fully with its investigation. Specifically, QMI noted that all Peabody persons of interest exercised their right not to be interviewed by the agency. Among other things, the following observations were included in the report:

(a) Review of the mine's records suggests that gas trends were not given sufficient consideration, which may have impacted the way in which [trigger action response plans] were applied and actioned;

(b) Some key reports relating to the mine's ventilation plan, gas alarm system and explosion risk zone controls do not appear to have been reviewed or countersigned by key personnel, as required under the mine's safety and health management system;

(c) There is evidence that some boreholes located deep within the 9N goaf region were insufficiently sealed, allowing an ingress of oxygen into active goaves, with the potential to escalate conditions for spontaneous combustion;

(d) There is evidence to suggest that the gas drainage system was being operated to focus on management of methane instead of the potential spontaneous heating event that was occurring underground; and

(e) There is evidence to suggest the mine did not follow its own procedures relating to major ventilation changes.

90.    On this news, Peabody's stock fell $0.37, or 2 percent, closing at $18.13

on August 9, 2019, down from the previous day's close of $18.50.

## THE TRUTH EMERGES

91.     On October 29, 2019, the Company filed a Form 8-K showing a third quarter 2019 loss of $0.77 per share, missing analysts' consensus expectations by more than 50%, as compared to third quarter earnings 2018 of $0.63 per share a year prior. At the same time, Peabody disclosed that "due to the time, cost and required regulatory approach to ventilate and re-enter the rest of the mine…the company expects no meaningful North Goonyella volumes for three or more years, with development coal to be produced in the second half of 2020."

92.     On the same date, during the subsequent earnings call, Defendant Kellow stated: "Overall, we believe the highly restrictive approach from QMI has required a greatly disciplined approach from Peabody. As such, we have identified a preferred path, which . . . represent[s] significant lower risk, the best path to return the regular way mining and maximizes the value of a mine with a potential life of several decades." Defendant Kellow stated that the plans beginnings are still "contingent on obtaining pre-approval from QMI."

93.     On this news, the Company's stock fell $3.56, or 22 percent, closing at

$12.48 October 29, 2019, down from the previous day's close of $16.04.

**Duties Pursuant to the Company's Code of Business Conduct and Ethics**

94.     The Individual Defendants, as officers and/or directors of Peabody, were bound by the Company's Code of Business Conduct[34] (the "Code of Conduct"), which required the following:

> Peabody Energy Corporation, its subsidiaries and affiliates will, at all times, conduct their business in an ethical and safe manner and in strict compliance with all laws and regulations. This Code of Business Conduct and Ethics defines ethical standards to help all of us achieve the objective of establishing and maintaining a reputation as a world-class company. It applies to all directors, officers and salaried employees of Peabody Energy Corporation, its subsidiaries and affiliates, and any questions regarding acceptable conduct or interpretation of this Code should be directed to the Law Department (314-342-3400).
>
> This Code of Business Conduct and Ethics is not a part of a contract, and no employee of the Company has any contractual right as a result of or relating to the matters set forth in this Code. The contents of the Code are not a guarantee of employment. Additionally, the contents of the Code do not alter in any way your employment status.

---

[34] *See* Peabody Energy Corp., Code of Business Conduct and Ethics, https://www.peabodyenergy.com/Peabody/media/MediaLibrary/Sustainability/100-00-Code-of-Business-Conduct-and-Ethics-15-2-v4-POSTED.pdf.

## MISSION STATEMENT

Our mission is to create superior value for shareholders as the leading global supplier of coal, which enables economic prosperity and a better quality of life.

## INTRODUCTION

Our Mission Statement expresses our shared goals and expected standards of performance. It also lists seven core values, one of which is:

"Integrity: We act in an honest and ethical manner."

This value statement underpins The Code of Business Conduct and Ethics.

This Code of Business Conduct and Ethics defines ethical standards to help all of us achieve the objective of conducting our business affairs as a world-class company.

## COMPLIANCE WITH ALL LAWS

It is our policy to comply in all respects with the laws and regulations that apply to our business at all government levels (including tribal or indigenous group governments). You are expected to comply with the letter and spirit of such laws and regulations.

…

44

**A. Safety and Environmental Laws**

We are committed to providing a safe, healthy workplace and constantly strive to eliminate accidents in the workplace, wherever we do business. You are responsible for maintaining a safe and healthy workplace for all by following all of our safety rules and practices and reporting accidents, injuries and unsafe equipment, practices and conditions in a timely manner.

We are also committed to establishing and maintaining environmental protection programs that prevent injury to the environment in our operating communities. These programs are designed to enhance our reputation as a good corporate citizen and an industry leader and are, at a minimum, structured to comply with all applicable laws and regulations.

## <u>AUDIT COMMITTEE CHARTER</u>

95.     In addition to these duties, the Individual Defendants who served on the Audit Committee during the Relevant Period, Defendants Chirekos, Bertone, Champion, and Sutherlin (the "Audit Committee Defendants"), owed specific duties to Peabody under the Audit Committee Charter[35] (the "Audit Committee Charter"). According to the Audit Committee Charter, the Audit Committee shall provide:

---

[35] *See* Peabody Energy Corp., *Peabody Energy Corporation Audit Committee Charter* (Dec. 10, 2020), https://www.peabodyenergy.com/Peabody/media/MediaLibrary/2020-Audit-Charter.pdf.

assistance to the Board of Directors in fulfilling its oversight responsibility to the shareholders, potential shareholders, the investment community, and others with respect to (i) the quality and integrity of the Company's financial statements and financial reporting processes, (ii) the Company's systems of internal accounting and financial controls and disclosure controls, (iii) the independent auditor's qualifications and independence, (iv) the performance of the Company's internal audit function and independent auditor, and (v) compliance with legal and regulatory requirements. In so doing, it is the responsibility of the Committee to maintain free and open communication between the Committee, the independent auditor, the internal auditors and management of the Company.

## PEABODY ENERGY CORPORATION HEALTH, SAFETY, SECURITY AND ENVIRONMENTAL COMMITTEE CHARTER

96.    The Company's Health, Safety, Security and Environmental Committee Charter[36] (the "Safety Charter") states:

**Statement of Responsibilities**

The Committee shall have the following oversight responsibilities:

- review with management the significant risks or exposures faced by the Company in the health, safety, security and environmental areas, including such liabilities reported in the Company's public reports and financial statements, and steps taken by management to address such risks, including

---

[36] *See* Peabody Energy Corp., *Peabody Energy Corporation Health, Safety, Security and Environmental Committee Charter* (Dec. 10, 2020), https://www.peabodyenergy.com/Peabody/media/MediaLibrary/2020-HSSE-Charter.pdf.

contingency planning and emergency response activities;

- review at least annually the Company's health, safety, security and environmental objectives, policies and programs (including processes to ensure compliance with applicable laws and regulations), assessments of the effectiveness of such policies and programs (including periodic performance metrics and audits) and performance;

- review methods to communicate the Company's health, safety, security and environmental values and performance to Company employees and the public;

- review the Company's efforts to advance the Company's progress on sustainable development (i.e., the integration of social, environmental, and economic principles in the Company's mining operations from exploration through development, operation, reclamation, closure and post closure activities);

- review and discuss with management any material noncompliance with health, safety, security and environmental laws, including any pending or threatened administrative, regulatory or judicial proceedings related to such noncompliance, and management's response to such noncompliance;

- review and recommend approval of the environmental and mine safety disclosures required to be included in the Company's periodic reports on Forms 10-K and 10-Q;

- consider and advise the Board of Directors on health, safety, security and environmental matters and sustainable

47

development, and on the health, safety, security or environmental risks or exposures associated with projects for which management is seeking Board approval;

- consider and advise the Compensation Committee on the Company's performance with respect to incentive compensation metrics relating to health, safety, security or environmental matters; and

- review and discuss with management significant legislative, regulatory, political and social issues and trends that may affect the health, safety, security and environmental management process and system in place at the Company or the Company's business operations, financial performance or public image, and management's response to such matters.

\*\*\*

The Committee shall have the authority to obtain advice and assistance from internal or external legal, accounting and other advisors. In making any such decisions, the Committee should consult with the Chair of the Board or the Lead Independent Director, as applicable. The compensation to be paid to such advisors shall be determined by the Committee or the Chairperson of the Committee, and the Chairperson shall have the authority to bind the Company to pay such compensation and enter into other customary retention arrangements.

The Committee should make regular reports on its activities to the Board of Directors. The Committee may form and delegate authority to subcommittees when appropriate.

The Committee shall (i) review and reassess the adequacy of this charter annually and recommend any proposed changes to the Board

of Directors for approval, and(ii) annually review its own performance and report the results of this evaluation to the Board of Directors.

97.     Defendants Bertone, Gorman, Laymon and Yeates served on the Company's Health, Safety, Security & Environmental Committee during the Relevant Period. Pursuant to this Committee's Charter, these Defendants were responsible for, but utterly failed to review with management the significant risks or exposures faced by the Company in the health, safety, security and environmental areas, including taking steps to address and avoid such risks, such as contingency planning and emergency response activities.

98.     As members of the Health, Safety, Security & Environmental Committee, Defendants Bertone, Gorman, Laymon and Yeates knowingly and consciously allowed the authorization of false and misleading statements, failed to timely correct such statements, failed to take necessary and appropriate steps to ensure that the Company's internal controls were sufficiently robust and effective (and were being implemented effectively), and failed to take necessary and appropriate steps to ensure that the Board's duties were being discharged in good faith and with the required diligence.

49

**The False and Misleading Proxies**

99.     In addition to the above false and misleading statements issued and/or caused to be issued by the Individual Defendants, certain Individual Defendants, including Chirekos, Bertone, Gorman, Kellow, Laymon, Malone, and Sutherlin (the "Proxy Defendants") also caused the Company to issue one or more of the below false and misleading proxy statements during the Relevant Period. The Proxy Defendants drafted, approved, and reviewed one or more Form DEF14As before they were filed with the SEC. Those Forms were filed on March 28, 2018 (the "2018 Proxy") and March 27, 2019 (the "2019 Proxy") respectively. The Proxy Defendants negligently issued materially misleading statements in the 2018 Proxy and/or the 2019 Proxy (the "Proxies"), both signed by non-party Verona Dorch and Defendant Malone.[37]

100.    The 2018 Proxy sought stockholder votes to, among others, elect

---

[37] These proxy allegations are based solely on negligence.  They are not based on any allegations of recklessness or knowing conduct by or on behalf of the Individual Defendants, and they do not allege fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to the proxy allegations and related claims.

defendants Chirekos, Gorman, Kellow, Laymon, Malone, Sutherlin, and others for a one-year term.

101.   In support of the Proxy Defendants' bid to reelect defendants Chirekos, Gorman, Kellow, Laymon, Malone, and Sutherlin, the 2018 Proxy assured stockholders that the Board and its committees regularly assess and manage the risks that Peabody faces, including legal and regulatory risks, financial controls, and risks associated with compensation programs and plans. The 2018 Proxy first stated:

> The Board oversees an enterprise-wide approach to risk management, designed to support the achievement of organizational objectives, including strategic objectives, to enhance long-term organizational performance and stockholder value. A fundamental part of risk management is not only understanding the risks we face, how those risks may evolve over time, and what steps management is taking to manage and mitigate those risks, but also understanding what level of risk tolerance is appropriate for us. Management is responsible for the day-to-day management of the risks we face, while the Board, as a whole and through its committees, is responsible for the oversight of risk management.

> In its risk oversight role, the Board has the responsibility to satisfy itself that the risk management processes designed and implemented by management are adequate and functioning as designed. The Board regularly reviews information regarding marketing, operations, safety performance, trading, finance and business development as

well as the risks associated with each. In addition, the Board holds strategic planning sessions with management to discuss our strategies, key challenges, and risks and opportunities. The full Board receives reports on our enterprise risk management initiatives on at least an annual basis.

While the Board is ultimately responsible for risk oversight, Board committees also have been allocated responsibility for specific aspects of risk oversight. The Audit Committee assists the Board in fulfilling its oversight responsibilities with respect to risk management in the areas of financial reporting, internal controls, risk assessment and risk management. The Compensation Committee assists the Board in fulfilling its oversight responsibilities with respect to the risks arising from our compensation policies and programs. The Health, Safety, Security and Environmental Committee assists the Board in fulfilling its oversight responsibilities with respect to the risks associated with our health, safety, security and environmental objectives, policies and performance. The Nominating and Corporate Governance Committee assists the Board in fulfilling its oversight responsibilities with respect to the risks associated with board organization, membership and structure, ethics and compliance, political contributions and lobbying expenditures, succession planning for our directors and executive officers, and corporate governance.

102.   The 2018 Proxy also stated:

### AUDIT COMMITTEE REPORT

The Company's management is responsible for preparing financial statements in accordance with accounting principles generally accepted in the United States ("GAAP") and the financial reporting process, including the Company's disclosure controls and procedures and internal control over financial reporting. The Company's

independent registered public accounting firm is responsible for (i) auditing the Company's financial statements and expressing an opinion as to their conformity to GAAP and (ii) auditing the effectiveness of the Company's internal control over financial reporting and expressing an opinion as to its effectiveness. The Audit Committee of the Board, composed solely of independent directors, meets periodically with management, including the Vice President, Internal Audit (the employee with primary responsibility for the Company's internal audit functions) and others in the Company, and the Company's independent registered public accounting firm to review and oversee matters relating to the Company's financial statements, audit services (internal audit) activities, disclosure controls and procedures, and internal control over financial reporting and non-audit services provided by the independent accountants.

The Audit Committee has reviewed and discussed with management and Ernst & Young LLP ("EY"), the Company's independent registered public accounting firm, the Company's audited financial statements for the fiscal year ended December 31, 2017. The Audit Committee has also discussed with EY the matters required to be discussed by Auditing Standard No. 16 (codified as Auditing Standard No. 1301), "Communications with Audit Committees" issued by the Public Company Accounting Oversight Board ("PCAOB"). In addition, the Audit Committee received from EY the written disclosures and the letter required by applicable requirements of the PCAOB regarding EY's communications with the Audit Committee concerning independence, discussed with EY its independence from the Company and the Company's management, and considered whether EY's provision of non-audit services to the Company is compatible with maintaining the auditor's independence.

The Audit Committee conducted its own self-evaluation and evaluation of the services provided by EY during the fiscal year ended December 31, 2017. Based on its evaluation of EY, the Audit Committee reappointed EY as the Company's independent registered public accounting firm for the fiscal year ending December 31, 2018.

Based on the reviews and discussions referred to above, the Audit Committee recommended to the Board that the Company's audited financial statements be included in the Annual Report on Form 10-K for the fiscal year ended December 31, 2017, for filing with the SEC.

103.   The 2018 Proxy assured stockholders that the Individual Defendants were involved with Peabody's operations, actively monitored the Company's risks and exposures, and acted in an ethical and legal manner. In reality, the Individual Defendants were utterly failing in their oversight duties by allowing the Company to operate with inadequate internal controls which resulted in the failure to disclose: (a) the Company had failed to implement adequate safety controls at the North Goonyella Mine to prevent the risk of a spontaneous combustion event; (b)  the Company failed to follow its own safety procedures; and (c) that, as a result of the foregoing,  the North Goonyella Mine was at a heightened risk of shutdown.

104.   As a result of these misleading statements, the Company's stockholders voted via an uninformed stockholder vote to reelect defendants Chirekos, Gorman,

Kellow, Laymon, Malone, and Sutherlin.

105.   The 2018 Proxy was false and misleading because, while it assured investors that Peabody's Code of Business Conduct and its Audit Committee Charter were followed during the preceding fiscal year, the omissions and non-disclosures during the Relevant Period, as outlined herein, demonstrated that the Individual Defendants did not comply with the stated provisions of those documents when filing public statements regarding the affairs of the Company with the SEC.

106.   The 2019 Proxy sought stockholder votes to, among other things, elect defendants Bertone, Chirekos, Gorman, Kellow, Laymon, and Malone for a one-year term.

107.   In support of the Proxy Defendants' bid to reelect defendants Bertone, Chirekos, Gorman, Kellow, Laymon, and Malone, the 2019 Proxy assured stockholders that the Board and its committees regularly assessed and managed the risks that Geron faced, including legal and regulatory risks, financial controls, and risks associated with compensation programs and plans. First, the 2019 Proxy stated:

> The Board oversees an enterprise-wide approach to risk management, designed to support the achievement of organizational objectives, including strategic objectives, to enhance long-term

organizational performance and stockholder value. A fundamental part of risk management is not only understanding the risks we face, how those risks may evolve over time, and what steps management is taking to manage and mitigate those risks, but also understanding what level of risk tolerance is appropriate for us. Management is responsible for the day-to-day management of the risks we face, while the Board, as a whole and through its committees, is responsible for the oversight of risk management.

In its risk oversight role, the Board has the responsibility to satisfy itself that the risk management processes designed and implemented by management are adequate and functioning as designed. The Board regularly reviews information regarding marketing, operations, safety performance, trading, finance and business development as well as the risks associated with each. In addition, the Board holds strategic planning sessions with management to discuss our strategies, key challenges, and risks and opportunities. The full Board receives reports on our enterprise risk management initiatives on at least an annual basis.

While the Board is ultimately responsible for risk oversight, Board committees also have been allocated responsibility for specific aspects of risk oversight. The Audit Committee assists the Board in fulfilling its oversight responsibilities with respect to risk management in the areas of financial reporting, internal controls, risk assessment and risk management. The Compensation Committee assists the Board in fulfilling its oversight responsibilities with respect to the risks arising from our compensation policies and programs. The Health, Safety, Security and Environmental Committee assists the Board in fulfilling its oversight responsibilities with respect to the risks associated with our health, safety, security and environmental objectives, policies and performance. The Nominating and Corporate Governance Committee assists the Board in fulfilling its oversight responsibilities with respect to the risks

associated with board organization, membership and structure, ethics and compliance, political contributions and lobbying expenditures, succession planning for our directors and executive officers, and corporate governance.

108.   Second, the 2019 Proxy stated:

## AUDIT COMMITTEE REPORT

The company's management is responsible for preparing financial statements in accordance with accounting principles generally accepted in the United States ("GAAP") and the financial reporting process, including the company's disclosure controls and procedures and internal control over financial reporting. The company's independent registered public accounting firm is responsible for (i) auditing the company's financial statements and expressing an opinion as to their conformity to GAAP and (ii) auditing the effectiveness of the company's internal control over financial reporting and expressing an opinion as to its effectiveness. The Audit Committee of the Board, composed solely of independent directors, meets periodically with management, including the Vice President, Internal Audit (the employee with primary responsibility for the company's internal audit functions) and others in the company, and the company's independent registered public accounting firm to review and oversee matters relating to the company's financial statements, audit services (internal audit) activities, disclosure controls and procedures, and internal control over financial reporting and non-audit services provided by the independent accountants.

The Audit Committee has reviewed and discussed with management and Ernst & Young LLP ("EY"), the company's independent registered public accounting firm, the company's audited financial statements for the fiscal year ended December 31, 2018. The Audit

Committee has also discussed with EY the matters required to be discussed by Auditing Standard No. 16 (codified as Auditing Standard No. 1301), "Communications with Audit Committees" issued by the Public Company Accounting Oversight Board ("PCAOB"). In addition, the Audit Committee received from EY the written disclosures and the letter required by applicable requirements of the PCAOB regarding EY's communications with the Audit Committee concerning independence, discussed with EY its independence from the company and the company's management, and considered whether EY's provision of non-audit services to the company is compatible with maintaining the auditor's independence.

The Audit Committee conducted its own self-evaluation and evaluation of the services provided by EY during the fiscal year ended December 31, 2018. Based on its evaluation of EY, the Audit Committee reappointed EY as the company's independent registered public accounting firm for the fiscal year ending December 31, 2019.

Based on the reviews and discussions referred to above, the Audit Committee recommended to the Board that the company's audited financial statements be included in the Annual Report on Form 10-K for the fiscal year ended December 31, 2018, for filing with the SEC.

109.   The 2019 Proxy assured stockholders that the Individual Defendants were involved with Peabody's operations, actively monitored the Company's risks and exposures, and acted in an ethical and legal manner. In reality, the Individual Defendants were utterly failing in their oversight duties by allowing the Company to operate with inadequate internal controls which resulted in the failure to disclose: (a) the  Company's low-cost plan to restart operations at the North Goonyella Mine

posed unreasonable safety and environmental risks; (b) the Australian body responsible for ensuring acceptable health and safety standards, the Queensland Mines Inspectorate ("QMI"), would likely mandate a safer, cost- prohibitive approach; and (c) that, as a result of the foregoing,  there would be major delays in reopening the North Goonyella Mine and restarting coal production.

110.   As a result of these misleading statements, the Company's stockholders voted via an uninformed stockholder vote to reelect defendants Bertone, Chirekos, Gorman, Kellow, Laymon, and Malone.

111.   The above Proxies were false and misleading because, while they assured investors that Peabody's Code of Business Conduct and its Audit Committee Charter were followed during the preceding fiscal year, the omissions and non-disclosures during the Relevant Period, as outlined herein, demonstrated that the Individual Defendants did not comply with the stated provisions of those documents when filing public statements regarding the affairs of the Company with the SEC.

## **FIDUCIARY DUTIES**

112.   By reason of their positions as officers, directors, and/or fiduciaries of Peabody and because of their ability to control the business and corporate affairs of

59

Peabody, Individual Defendants owed Peabody and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Peabody in a fair, just, honest, and equitable manner. Individual Defendants were and are required to act in furtherance of the best interests of Peabody and its shareholders so as to benefit all shareholders equally.

113.   Each director and officer of the Company owes to Peabody and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

114.   Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

115.   To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

116.   Individual Defendants, by virtue of their positions as directors and/or

60

officers, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised the Board at all relevant times.

117.    As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present

and future business prospects, and had a duty to cause the Company to disclose omissions of material fact in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

118.   To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of the Company were required to, among other things:

(a)   ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws;

(b)   conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)   remain informed as to how Peabody conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in

connection therewith, and to take steps to correct such conditions or practices;

(d)    establish and maintain systematic and accurate records and reports of the business and internal affairs of Peabody and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)    maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Peabody' operations would comply with all applicable laws and Peabody' financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)    exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required

by law to disseminate;

(g)    refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)    examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

119.   Each of the Individual Defendants further owed to Peabody and the shareholders the duty of loyalty requiring that each Individual Defendant favor Peabody's interest and that of its shareholders over his or her own while conducting the affairs of the Company and refrain from using his or her position, influence, or knowledge of the affairs of the Company to gain personal advantage.

120.   At all times relevant hereto, Individual Defendants were the agents of other and of Peabody and were at all times acting within the course and scope of such agency.

121.   Because of their advisory, executive, managerial, and directorial

positions with Peabody, each of the Individual Defendants had access to adverse, non-public information about the Company.

122.   Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements made by Peabody.

## BREACHES OF DUTIES

123.   The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and/or directors of Peabody, the absence of good faith on their part, and a reckless disregard for their duties to the Company.

124.   The Individual Defendants breached their duty of loyalty and good faith by utterly failing to implement a reasonable, relevant, meaningful, and well-constituted system of internal controls, especially with respect to disclosure of material information regarding the extensive problems the Company was encountering, in connection with the North Goonyella Mine. The Individual Defendants also breached their duty of loyalty and good faith by allowing the

Company to cause, or by themselves causing, the Company to make improper statements to the public and the Company's stockholders. These unlawful practices wasted the Company's assets and caused Peabody substantial damage.

125.    The Individual Defendants who served on the Audit Committee during the Relevant Period had a duty to review the Company's earnings press releases and regulatory filings. The members of the Audit Committee breached their duty of loyalty and good faith by approving the omission of material information, making the improper statements detailed herein, and failing to properly oversee Peabody's public statements and internal control function.

126.    The Individual Defendants who served on the Health, Safety, Security and Environmental Committee were responsible for reviewing with management the significant risks or exposures faced by the Company in the health, safety, security and environmental areas, including such liabilities reported in the Company's public reports and financial statements, and steps taken by management to address such risks, including contingency planning and emergency response activities.  Those defendants breached their duty of loyalty and good faith by failing to properly oversee Peabody's internal controls and the safety procedures at the North

Goonyella Mine to prevent the risk of a spontaneous combustion event and failed to ensure the Company followed its own safety procedures. Indeed, the QMI's finding that "some key reports relating to the mine's ventilation plan, gas alarm system and explosion risk zone controls do not appear to have been reviewed or countersigned by key personnel, as required under the mine's safety and health management system" was reflective of this committee's failure of oversight.

127.   The Individual Defendants, because of their positions of control and authority as officers and/or directors of Peabody, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein. The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions. In addition, as a result of Individual Defendants' improper course of conduct, the Company is now the subject of the Federal Securities Class Action, which alleges violations of federal securities laws. As a result, Peabody has expended, and will continue to expend, significant sums of money.

## **DAMAGES TO PEABODY**

128.   The improper accounting practices and reporting, risk assessment and

environmental and safety procedures have exposed the Company to myriad reputational and financial damages, including but not limited to:

(a) Possible restatements and goodwill impairments;

(b) Liability arising from the Federal Securities Class Action;

(c) The loss of credibility with customers and suppliers;

(d) Legal and accounting costs associated with litigation, investigations, and restatements; and

(e) Major delays in reopening the North Goonyella Mine, and consequential losses of approximately $950,000,000 in revenues of the Company's largest operation in 2019.[38]

---

[38] *See* Press Release, Peabody Energy Corp., *Peabody Reports Earnings For Quarter Ended March 31, 2019* (May 1, 2019), https://www.peabodyenergy.com/Home/Company-News-1034; Press Release, Peabody Energy Corp., *Peabody Reports Earnings For Quarter Ended June 30, 2019* (July 31, 2019), https://www.peabodyenergy.com/Home/Company-News-1042; Press Release, Peabody Energy Corp., *Peabody Reports Earnings For Quarter Ended September 30, 2019* (Oct. 29, 2019), https://www.peabodyenergy.com/Home/Company-News-1054; Press Release, Peabody Energy Corp., *Peabody Reports Earnings for Quarter and Year Ended December 31, 2019* (Feb. 5, 2020), https://www.sec.gov/Archives/edgar/data/1064728/000106472820000003/btu8k20200205exh991.htm.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

129.   Plaintiff brings this action derivatively and for the benefit of Peabody to redress injuries suffered, and to be suffered, because of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Peabody, waste of corporate assets, unjust enrichment, and violations of Sections 14(a) and 20(a) as well as the aiding and abetting thereof.

130.   Peabody is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

131.   Plaintiff is, and has been continuously at all relevant times, a stockholder of Peabody. Plaintiff will adequately and fairly represent the interests of Peabody in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

132.   Plaintiff incorporates by reference and re-alleges each allegation stated above as if fully set forth herein.

133.   A pre-suit demand on the Board of the Company is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following

eleven (11) individuals: Defendants Algaze, Bertone, Chirekos, Gorman, Kellow, Laymon, Malone, Miller, Sutherlin, Yeates, and Champion (the "Director-Defendants"). Plaintiff needs only to allege demand futility as to six of these eleven Directors.

134.   Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the schemes they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material fact.

135.   In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was, *inter alia*, intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

136.   Defendant Kellow is incapable of considering a demand to commence

70

and vigorously prosecute this action because he faces substantial likelihood of liability as he is a named defendant in the Federal Securities Class Action. Defendant Kellow, also the Company's President and CEO, is not an independent director. Defendant Kellow is not disinterested for purposes of demand futility because his principal occupation is CEO of the Company.

137.   Defendant Yeates is the Company's Executive Vice President and Chief Operating Officer and is not an independent director. Defendant Yeates is not disinterested for purposes of demand futility because his principal occupation is Executive Vice President and Chief Operating Officer of the Company

138.   Defendants Bertone, Chirekos, and Sutherlin served on the Company's Audit Committee during the Relevant Period. Pursuant to the Company's Audit Committee Charter, the Audit Committee members were responsible for overseeing the Company's financial reporting process, the integrity of the Company's financial statements, the Company's compliance with legal and regulatory requirements, and the Company's internal controls over financial reporting. The Audit Committee failed to ensure the integrity of the Company's financial statements, allowing the Company to file false and misleading financial statements with the SEC, and to failed

to maintain internal controls. Therefore, these Defendants (as members of the Audit Committee) breached their fiduciary duties, are not disinterested, and demand is excused as to them.

139.   Defendants Bertone, Gorman, Laymon and Yeates served on the Company's Health, Safety, Security & Environmental Committee during the Relevant Period.  Pursuant to this Committee's Charter, these Defendants were responsible for, but utterly failed to review with management the significant risks or exposures faced by the Company in the health, safety, security and environmental areas, including taking steps to address and avoid such risks, such as contingency planning and emergency response activities. Therefore, these Defendants, as members of the Health, Safety, Security & Environmental Committee, breached their fiduciary duties, are not disinterested, and demand is excused as to them.

140.   Moreover, as members of the Health, Safety, Security & Environmental Committee, Defendants Bertone, Gorman, Laymon and Yeates knowingly and consciously allowed the authorization of false and misleading statements, failed to timely correct such statements, failed to take necessary and appropriate steps to ensure that the Company's internal controls were sufficiently robust and effective

(and were being implemented effectively), failed to take necessary and appropriate steps to ensure that the Board's duties were being discharged in good faith and with the required diligence. This constituted breaches of the fiduciary duties of loyalty and good faith, for which the Defendants Bertone, Gorman, Laymon and Yeates face a substantial likelihood of liability. If Defendants Bertone, Gorman, Laymon and Yeates were to bring a suit on behalf of Peabody to recover damages sustained as a result of this misconduct, they would expose themselves to significant liability. This is something they will not do. For this reason, demand is futile as to Defendants Bertone, Gorman, Laymon and Yeates.

141.   Moreover, Defendants Miller, Algaze, Yeats, and Champion owe dual loyalties to the Company and Elliott Management L.P. - the Company's single largest shareholder owning approximately 30% of the Company.

142.   On February 4, 2020, the Company entered into an agreement with Elliott Management L.P. (the "Elliott Agreement") regarding various matters agreed between the parties thereto including, but not limited to, the appointment of directors, procedures for determining replacements for the newly appointed directors, voting commitments, "standstills" restricting certain conduct and activities

73

during the periods specified in the Elliott Agreement, non-disparagement and other items that are addressed separately in the Elliott Agreement.

143.   Pursuant to the Elliott Agreement, on February 20, 2020, the Board increased the size of the Board from 10 directors to 12 directors and appointed Algaze, Miller and Yeates to serve as directors of Peabody.  Mr. Champion also joined the Board on July 15, 2020 as an Elliott appointee under the Elliott Agreement.

144.   Elliott exercises a significant degree of control over the Company through its four Board members. The Elliott Agreement further provides that the Company agreed to retain a consultant to conduct a review of the performance of the Company's Australian mining operations. The Company will also reimburse Elliott for (i) 50% of its reasonable documented out-of-pocket fees and expenses incurred in connection with Elliott's involvement at the Company not to exceed a threshold specified in the Elliott Agreement and (ii) 50% of the documented out-of-pocket fees and expenses actually incurred in connection with the provision of services of an additional consultant to be engaged by Elliott.

145.   Defendant Miller is an Equity Partner and Senior Portfolio Manager

74

and Head of U.S. Restructuring for Elliott Management and Defendant Algaze is a Portfolio Manager at Elliott Management. Defendants Miller and Algaze would not consider filing suit against one another because they both work for the same company. Further, Defendant Algaze would not consider filing suit against Defendant Miller because Defendant Miller is an Equity Partner at Elliott Management and has the power to terminate Defendant Algaze's employment with Elliott Management. Thus, demand is futile as to Defendants Miller and Algaze. Moreover, Elliott Management L.P. is the Company's single largest shareholder owning approximately 30% of the Company and controls four board members.

**Insurance Considerations**

146.   The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, *i.e.*, monies belonging to the stockholders of Peabody. If there is a directors' and officers' liability insurance policy covering the Relevant Period, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter*

75

*alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain officers of Peabody, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

147.   If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Peabody to sue any other wrongdoers, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

148.   Thus, for all the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least a majority of Director-Defendants, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

# FIRST CLAIM

## Against Individual Defendants
*for Violations of Sections 14(a) of the Exchange Act*

149.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

150.   The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these non-fraud claims.

151.   Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security)

77

registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

152.   Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

153.   The Proxy also stated that the Company's directors and employees, including its principal executive officer, principal financial officer, principal accounting officer, and controller, or persons performing similar functions, are subject to the Company's Code of Conduct.   The Proxy was also false and misleading because, despite assertions to the contrary, Peabody's compliance with its respective codes of conduct were not followed, as the Individual Defendants made and/or caused the Company to make the false and misleading statements discussed herein.

154.   In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material

facts, the statements contained in the 2020 Proxy Statement was materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for stockholder determination in the 2020 Proxy Statement, including, but not limited to, election of directors, ratification of an independent auditor, and the approval of executive compensation.

155.   The false and misleading elements of the annual Proxy led to the re-elections of all of the Director Individual Defendants, allowing them to continue breaching their fiduciary duties to Peabody.

156.   The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the Proxies.

157.   Plaintiff on behalf of Peabody has no adequate remedy at law.

## SECOND CLAIM

### Against Individual Defendants
*for Breach of Fiduciary Duties*

158.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

159.   Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Peabody's

business and affairs.

160.   Each of the Individual Defendants violated and breached their fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

161.   The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Peabody.

162.   In breach of their fiduciary duties, the Individual Defendants caused the Company to engage in the misconduct described herein.

163.   In further breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure, controls, and procedures.

164.   Plaintiff on behalf of Peabody has no adequate remedy at law.

### THIRD CLAIM

**Against Individual Defendants**
*for Unjust Enrichment*

165.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

166.   During the Relevant Period, Defendants received bonuses, stock options, and/or similar such compensation from Peabody that were tied to the financial performance of the Company. Individual Defendants were unjustly enriched thereby.

167.   To remedy Defendants' unjust enrichment, this Court should order Defendants to disgorge their unjustly obtained bonuses and compensation.

168.   Plaintiff on behalf of Peabody has no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants
*for Waste of Corporate Assets*

169.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

170.   As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, Individual Defendants have caused Peabody to waste valuable corporate assets, to incur many millions of dollars of legal liability and costs to defend unlawful actions, and to lose financing from investors and business from future customers who no longer trust the Company and its products. As a result of the waste of corporate assets, Individual Defendants are

81

each liable to the Company.

171.   Because of the waste of corporate assets, the Individual Defendants are each liable to the Company.

172.   Plaintiff on behalf of Peabody has no adequate remedy at law.

## DEMAND FOR TRIAL BY JURY

Plaintiff demands a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

A.   Declaring that Plaintiff may maintain this action on behalf of Peabody, and that Plaintiff is an adequate representative of the Company;

B.   Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Peabody;

C.   Determining and awarding to Peabody the damages sustained by it because of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre- and post-judgment interest thereon;

D.   Directing Peabody and the Individual Defendants to take all necessary

actions to reform and improve the Company's corporate governance and internal procedures to comply with applicable laws and protect Peabody and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1)   A proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board; and

2)   A proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

E.   Awarding Peabody restitution from Individual Defendants;

F.   Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

G.   Granting such other and further relief as the Court may deem just and proper.

83

Dated: February 10, 2021                    Respectfully submitted,

                                            **BIELLI & KLAUDER, LLC**

                                            */s/ Ryan M. Ernst*
                                            Ryan M. Ernst (No. 4788)
                                            David M. Klauder (No. 5769)
                                            1204 N. King Street
                                            Wilmington, DE 19801
                                            (302) 803-4600
                                            rernst@bk-legal.com
                                            dklauder@bk-legal.com

                                            **LEVI & KORSINSKY, LLP**
                                            Gregory M. Nespole
                                            Correy A. Kamin
                                            55 Broadway, 10th Floor
                                            New York, NY 10006
                                            T. 212.363.7500
                                            F. 212.363.7171
                                            gnespole@zlk.com
                                            ckamin@zlk.com

                                            *Attorneys for Plaintiff*
                                            *Pasqualino Di Fusco*